**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Criminal Action |
| ) | No. 03-03132-03-CR-S-RED |
| RAYMOND G. McELROY, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

Defendant filed a Motion to Suppress Evidence, in which he asserts that evidence seized as a result of a search of his vehicle on March 18, 2002, should be suppressed. The United States filed its response. The matter was set for an evidentiary hearing, which was held before the undersigned on August 31, 2005. The defendant was present with counsel, Jason Coatney, and the United States was represented by Randall Eggert, Assistant United States Attorney.

It is defendant's position that when he was stopped by police officers, who were investigating the purchase of methamphetamine, he was not free to leave, not free to decline the officer's request to search, and not free to otherwise terminate the encounter. Therefore, he asserts that his stop was a de facto arrest, and that he should have been advised of his rights. He contends that his consent to the search was not knowing and voluntary because he had not been advised of his Miranda rights.

The government responds that Officer Becket had the authority to stop defendant because he observed a traffic violation. Further, it is contended that the stop was a proper Terry stop

1

because, under the totality of the circumstances, there was more than enough reasonable suspicion to believe that defendant was engaging in criminal activity at the time of the stop. Regarding the consent issue, the government contends that defendant's consent was not coerced because he was informed of why he was stopped, the time between the stop and when he gave consent was brief, and there is no evidence that the officers threatened or intimidated defendant. Finally, it is asserted that even if consent were considered to have been coerced, sufficient probable cause existed to allow for the search of the defendant's vehicle after the stop.

The government called Officer Jim Becket. On March 18, 2002, he was working as a patrol officer for the Missouri State Highway Patrol. He was working on 60 Highway near Kansas Expressway. That evening, he received information from Task Force Officer Dan Nash about a subject purchasing several packages of cold pills at a Target on South Glenstone. He reported the subject was driving an older model red pick-up, and he gave him the license number. A few minutes later, Officer Beckett saw the vehicle and observed it change lanes and exit on Kansas Expressway without using the right turn signal. He activated his lights and the vehicle stopped. The driver got out of the truck and met the driver at the back of his truck. Defendant asked him why he stopped him, and the officer told him about the cold tablet purchase and the fact that he did not use his right turn signal. Defendant said he and his wife bought the cold pills because they had severe allergies. Defendant provided a fictitious name and date of birth, although the officer did not know this at the time. He ran the license plate number on the truck, and it came back not on file with the Missouri Department of Revenue. He told defendant about this, and he responded that the truck wasn't his, but he was fixing it for a friend. He reiterated that he had really bad allergies. The officer asked if he had any guns or drugs in the vehicle, and defendant said he did not. The officer testified that

2

defendant told him that he could search if he wanted to. Officer Nash and another task force officer were also on the scene. When defendant's wife exited the truck, Officer Beckett saw a brown paper bag of pseudoephedrine on the floorboard. When he ran a check on the VIN number, it was discovered that the vehicle had been stolen from Webster County in 2000. Defendant said he didn't know anything about this; he was just fixing the truck for a friend. Defendant then gave the officer his correct name and date of birth. A driver's license's check indicated that he had five prior convictions for driving while suspended or revoked in the state of Missouri.

It was the officer's testimony that he stopped defendant because of the report of drugs and the traffic violation. When he observed the pseudoephedrine in the brown paper bag, he decided to arrest the defendant. This observation occurred after defendant had given consent to search. With the information from Officer Nash, he believed defendant had engaged in criminal activity, and he felt he could have searched the vehicle on the basis of probable cause to believe criminal activity had occurred.

On cross-examination, the officer testified that he initially received the call from Officer Nash at 7:00 p.m. and pulled defendant over at 7:30 p.m. When he pulled defendant over, Officer Nash was behind him. They were communicating via their cell phones. Officer Nash said he personally witnessed defendant purchase pseudoephedrine. Officer Becket's instructions were to stop and see if the pseudoephedrine was still in the vehicle. He knew defendant had contraband in the vehicle when he pulled him over. He did not advise defendant of his <u>Miranda</u> rights. Provided that he found pseudoephedrine, he reiterated that he would have arrested defendant. He asked defendant if he had any guns or drugs. That is a typical question he asks. He knew when he pulled him over that he was going to search the vehicle. He admitted that he personally never advised

3

defendant of his Miranda rights. He stated that he released defendant to Officer Nash, and was in the area when he talked to him, but could not hear what was being said. He patted defendant down when he turned him over to Officer Nash. He ran his driving history, but not his criminal history, so he had no information about his criminal conduct at that time. To the best of his recollection, the drugs were in a brown paper bag. The officer was going to pull defendant over, regardless of the traffic violation. Defendant never got back in the vehicle, and the officer testified that he was not fearful for his safety at that time.

On redirect, the officer testified that he was at the office completing paperwork when the call came in. It took him about 15 minutes to get there. He saw the vehicle and saw the traffic violation. The purpose in stopping was to ascertain what was inside; the officer really had no idea. Based on the information he had, if defendant had not had pseudoephedrine, he would have been arrested for the stolen vehicle.

On recross examination, when the officer determined that defendant did not have a valid driver's license, he was sitting in the patrol car. He does not recall that Officer Nash specifically told him to pull the vehicle over. According to what he was told, defendant had engaged in criminal conduct, but he would not have arrested him for that without having evidence of the pseudoephedrine.

The next witness for the government, Sergeant Dan Nash, was employed as a patrolman for the Missouri State Highway Patrol at this time. He was working on an investigation of defendant on the day in question. He received a report from security officer at the Target Store that a white male and female were in the store buying suspicious amounts of pseudoephedrine. He was told that they had done this before. He went to the store, conducted surveillance on the subjects, they left,

4

and law enforcement officers followed them.  They went from Target to Wal-Mart.  They each purchased pseudoephedrine there, which was observed by two undercover officers.  These officers said they saw defendant and his wife buy the drugs at separate locations and separate cash registers, which was what they had done at Target.  The two suspects went back to Target at some point, and Target was doing video surveillance of the suspects, so the officers didn't go in.  Target security officers advised them that both suspects had again purchased pseudoephedrine.  The officer testified that this practice is called "smurfing," which means making pseudoephedrine purchases at different locations to evade the law.  From his experience, individuals engaged in the manufacturing of methamphetamine will go around and buy the maximum legal amount of pseudoephedrine at different locations.  They then followed them to the Git and Go, and the officers attempted to go inside but there was too much traffic, so they didn't go in.

They made the decision, after this, to stop the vehicle because of reasonable suspicion of criminal activity based on their suspicious purchase of pseudoephedrine at different locations. Officer Nash was driving in an undercover vehicle, and pursuant to policy, they contact troopers with marked patrol cars to stop a suspect.  Officer Nash called Troop B and talked to Corporal Beckett.  He told him he was following a vehicle engaged in criminal activity, and needed a patrol car to come to the scene.  He listened to Corporal Beckett call in the license plate, which came back as not being on file.  He pointed out the vehicle to Corporal Becket, although Officer Nash could not see the traffic violation because of the patrol car in front of him.  He was advised by Corporal Beckett about what had occurred regarding the identification of defendant, that he had a revoked driver's license, and that the officer had seen a large amount of pseudoephedrine boxes laying in the front of the truck Defendant sat inside Officer Nash's unmarked vehicle, and within minutes,

5

Corporal Beckett reported that the vehicle was stolen.  Officer Nash read defendant his Miranda rights, and then questioned him about drug activity.  He told him he was providing individuals named Stan and Brian at Dennis's Place with methamphetamine supplies. Officer Nash had been investigating Stanley Duggins and Brian Bayzn regarding selling methamphetamine from Dennis's place. With defendant's permission, the officer looked in defendant's cell phone and confirmed that Stan was Stanley Duggins, the suspect in illegal drug activity and the subject of an ongoing investigation.  After this interview was concluded, he asked defendant if he would provide written consent for a search of his residence, which he did.  All the officers went to the residence to conduct the search.  More items of drugs contraband and evidence consistent with methamphetamine production were found there.  He did not threaten to shoot defendant, did not have a gun, and did not threaten to hurt him in anyway.   He did not have the defendant handcuffed.  Defendant was calm, and once they got beyond the fact of him providing an alias, the vehicle being stolen, and his license being revoked, he was very cooperative.  Defendant told him there was more stuff at his house and gave consent to search.  The officer reiterated that they pulled defendant over because he was suspected of having a large amount of pseudoephedrine.  If he hadn't had drugs and had not been in possession of a stolen car, he would not have been arrested.

On cross examination, the officer testified that he was trying to get any patrol car to pull over the car.  He wasn't sure where Corporal Beckett was.  After they left Wal-Mart, he decided they needed to stop the vehicle.  Even without the traffic violation, they would have pulled the vehicle over.  He asked Corporal Beckett to pull the vehicle over, and it was up to him to decide when to do this.  He probably had a gun in his briefcase, but denied that he ever said that he had a bad leg and would have to shoot defendant if he tried to run.  His partner was in the vehicle.  He did not hear

6

what Corporal Beckett said to defendant.

Defendant contends that he was in custody and subject to a custodial interrogation when he was placed in the patrol car, and that he should have been advised of his rights at that time. He argues that once Officer Beckett looked inside the vehicle, he was obliged to read defendant his rights. Therefore, he contends that any statements he made should be suppressed.

It is the government's position that probable cause existed to stop the vehicle. The government contends that investigative stops are permissible, and general questions can be asked by the officers. In this case, based on defendant's false answers, probable cause was further developed.

The law is well-established that a traffic violation provides an officer with probable cause to stop a vehicle, regardless of the severity of the violation. United States v. Jones, 275 F.3d 673, 680 (8th Cir. 2001); United States v. Enriquez Luna, 368 F.3d 876, 878 (8th Cir. 2004). It is clear, moreover, that a traffic stop based on violation of traffic laws does not violate the Fourth Amendment, "even if a reasonable officer would not have stopped the motorist absent some additional law enforcement objective." United States v. Whren, 517 U.S. 806 (1996). In this case, the undisputed evidence was that defendant failed to activate his turn signal when he made a right hand turn onto Kansas Expressway. Based on the testimony adduced at the hearing and applicable case law, the Court finds, initially, that there was a valid traffic stop based on a traffic violation.

Additionally, the evidence clearly establishes that this was a valid Terry stop based on reasonable suspicion of criminal activity. Terry v. Ohio, 392 U.S. 1 (1968). The officers had been working with Target security officers regarding illegal pseudoephedrine purchases; they had reports of defendant and his wife engaging in suspicious purchases of pseudoephedrine; they were observed

7

by undercover officers purchasing more pseudoephedrine at a Wal-Mart under similar suspicious circumstances; and they were seen going back to Target and it was reported that they purchased more of the cold medicine. There was clearly reasonable suspicion, if not probable cause, to believe that he was involved in criminal activity that would justify stopping his vehicle. Therefore, based on the traffic violation or the probable cause otherwise established by the suspicious pseudoephedrine purchases, the traffic stop was valid.

Once a valid traffic stop occurs, the investigating officer is only entitled to conduct an investigation reasonably related in scope to the circumstances that justified the initial stop. Terry v. Ohio, 392 U.S. 1 (1968). It is also clear that where an individual is detained after an initial lawful stop, the question is whether the detention was "reasonably related in scope to the circumstances which justified the interference in the first place." United States v. Cummins, 920 F.2d 498, 502 (8th Cir. 1990). Law enforcement officers are entitled to stop and briefly detain an individual for investigative purposes if there is reasonable suspicion that criminal activity may be afoot. United States v. Hill, 91 F.3d 1064, 1069 (8th Cir. 1996). A police officer may also run a computer check to establish whether the vehicle might have been stolen or whether there are outstanding warrants for any passengers in the car. See United States v. McManus, 70 F.3d 990, 993 (8th Cir. 1995); United States v. Johnson, 58 F.3d 356, 357 (8th Cir. 1995). Additionally, if the responses provided give rise to suspicions unrelated to the traffic offense, the officer's inquiry may be broadened. Johnson, 58 F.3d at 357.

Regarding the scope of the investigative stop, the Court finds that based on the credible evidence adduced at the hearing, it did not exceed the limits of a legitimate Terry stop. Once the lawful stop occurred, the officer could detain defendant while conducting a routine investigation

8

regarding his registration, driver's license, and criminal history checks. In this case, Officer Beckett testified that he performed a routine license plate check on the truck before he stopped the vehicle, and it was not on file. Defendant exited the vehicle on his own after being pulled over, and provided a false name and birth date. When the officer ran the VIN number check, he found that the vehicle was reported stolen in 2000. He took defendant to Officer Nash's car, after having patted him down. Once he obtained defendant's correct name, he ran a check on his driver's license, which he found to be revoked.

Officer Beckett testified that he asked defendant a routine question regarding whether he had any guns or drugs in the truck. Defendant stated that he did not, but said that the officer could search the vehicle. This evidence was uncontroverted. The officer had defendant get into Officer Nash's unmarked vehicle. It was Officer Nash's testimony that he <u>Mirandized</u> defendant and then interviewed him. He denied that he made any threat regarding shooting defendant should he decide to run.

Regarding the scope of the investigative stop, the Court finds that based on the credible evidence adduced at the hearing, it did not exceed the limits of a legitimate <u>Terry</u> stop. There was nothing presented to suggest that the investigative detention was unreasonable in length or was conducted in other than a routine manner.

In respect to defendant's consent, there is nothing before the Court to suggest that defendant's consent to search his vehicle was not voluntarily given. Further, there was no testimony that defendant attempted to withdraw that consent. Regarding the statements made after he was read his rights, there was no evidence adduced at the hearing to suggest that the officer acted in any manner that would suggest deceit, duress, or coercion, beyond defendant's unsupported innuendo

9

that he was threatened by Officer Nash, which the officer denied. Officer Nash testified, moreover, that defendant essentially assisted in the residential search by advising the officers that there was more stuff at his residence, and providing written consent for a search.

The Court finds that, based on the totality of the circumstances, the officer's decision to run a records check, and request consent to search the vehicle for evidence of illegal activity was objectively reasonable. Additionally, there is nothing before the Court to suggest that defendant's consent was not voluntarily given to make statements, once he had been <u>Mirandized</u>. He did not deny that he gave consent, and there was no evidence adduced at the hearing to suggest that the officer acted in any manner that would suggest duress or coercion. Further, he gave written consent to search his residence, a fact that is not in dispute. Based on the totality of the circumstances, the Court finds that defendant's consent was voluntarily given. <u>United States v. Chaidez,</u> 906 F.2d 377, 380-81 (8th Cir. 1990). Accordingly, the Court finds that it must be recommended that the motion to suppress be denied.

For the foregoing reasons, it is, pursuant to the governing law and in accordance with Local Rule 72.1 of the United States District Court for the Western District of Missouri, RECOMMENDED that defendant's Motion to Suppress Evidence be denied.

/s/ James C. England<br>
JAMES C. ENGLAND<br>
United States Magistrate Judge

Date: September 26, 2005